# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### KEY WEST DIVISION

### CASE NO. 13-10011-CIV-KING

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

vs.

BARRY J. GRAHAM,
FRED DAVIS CLARK, JR., A/K/A DAVE CLARK,
CRISTAL R. COLEMAN, A/K/A CRISTAL CLARK,
DAVID W. SCHWARZ, and
RICKY LYNN STOKES,

      Defendants.

_____/

## FINAL ORDER OF DISMISSAL

**THIS MATTER** comes before the Court upon Defendants Fred Davis Clark, Jr. and Cristal Coleman Clark's Motion for Final Summary Judgment (DE #60) ( "Clarks' MSJ"), David W. Schwarz's Motion for Final Summary Judgment (DE #62) ("Schwarz's MSJ"), Defendant Ricky Stokes' Motion for Summary Judgment (DE #88) ("Stokes' MSJ"), *pro se* Defendant Barry J. Graham's Notice of Joinder in Motions for Summary Judgment (DE #104) ("Graham's MSJ"), and Plaintiff Securities and Exchange Commission's Motion for Summary Judgment Against All Defendants (DE #90) ("SEC's MSJ"). These Motions are fully briefed or otherwise ripe for ruling.[1]

---

[1]     Plaintiff Securities and Exchange Commission ("SEC") failed to timely respond to both the Clarks' MSJ and Schwarz's MSJ (*see* Order Denying Plaintiff's Motion for Extension of Time DE #71), and those Motions are ripe for ruling. However, the SEC did respond to Stokes' MSJ (*see* DE #125), and did respond to the substance of both the Clarks' MSJ and Schwarz's MSJ when it responded to *pro se* Defendant Graham's MSJ (DE #131), which was simply a Notice adopting the arguments made by all of the represented defendants in their previously filed MSJs. Accordingly, the arguments raised by each of the defendants in their respective MSJs—even those raised in the Clarks' MSJ and Schwarz's MSJ to which no response was directly filed—have been fully responded to by the SEC. Defendant Ricky Stokes' Reply in Support of his MSJ appears at DE #147. The five defendants filed a total of four Responses in Opposition to the SEC's MSJ (*see* Defendant Fred Davis Clark, Jr., Cristal Clark, and David W. Schwarz's Response in Opposition to [the SEC's MSJ] at DE #122; Defendant Ricky Lynn Stokes' Opposition to [the SEC's MSJ] at DE #127, corrected by DE #142; and Defendant Barry J. Graham's Opposition to [the SEC's MSJ]at DE #130, and Defendant Barry J. Graham's Notice of Joinder in the Response and Adoption in Opposition to the Plaintiff's Claims at DE #134). Plaintiff SEC filed a total of four Replies to defendants' four Responses in Opposition (*see* DE #146; DE #148; DE #154; and DE #160). The Court has carefully untangled, reviewed, and fully considered this web of filings in its determination of the matters addressed herein.

The controlling issue of whether the Court has jurisdiction to determine the claims brought by Plaintiff SEC against the five individual Defendants in this case was the primary focus of oral argument by the parties on March 20, 2014. The Court took the matter under advisement at the conclusion of the hearing,[2] and this Order is limited to the determination of that single issue.[3] As set forth below, the Court finds that, by operation of the five-year statute of limitations contained at 28 U.S.C. § 2462, it lacks subject-matter jurisdiction over the SEC's claims against each of the five defendants in this case, and the Court must therefore dismiss this case with prejudice.

## I.   BACKGROUND

In this case, the SEC presents the tale of a far-reaching graft perpetrated by defendants upon upwards of 1,400 unsuspecting investors and to the tune of more than $300 million. According to the SEC, defendants directly, and through a vast web of entities collectively known as Cay Clubs Resorts and Marinas ("Cay Clubs"), offered and sold to these investors what were in fact unregistered securities, but under the guise of real estate investments. The defendants' sales pitches and marketing materials for these unregistered securities were laced with false and misleading statements, purporting, for example, to guarantee immediate returns on investment and provide investors with instant equity and astronomical rates of appreciation. Defendants promised to turn individual investors' purchase of units in condominium projects nation-wide

---

[2]        The Court also gave the parties the option of re-opening the record in this case and holding an evidentiary hearing on this issue, and while all of the defendants agreed to such a hearing, Plaintiff SEC did not advise the Court whether they too would be amenable to such a hearing. Accordingly, the Court determined that no such hearing would be held, and that the record would remain closed. *See* Order Cancelling Trial and Pretrial (DE #182). Notwithstanding the Court's indication at oral argument that an evidentiary hearing would be helpful to its determination of this issue, the Court finds that those parts of the record it had indicated were "perhaps vague" do not create a conflict such that an evidentiary hearing would be required.

[3]        The Court's Order Setting Oral Argument on Cross-Motions for Summary Judgment (DE #171) identified two issues on which the Court would hear oral argument, the second issue being whether the acts that form the basis of this action involved the sale of investment contracts, hence, securities within the jurisdiction of the SEC, or whether the acts involved simple real estate transactions. However, the Court only reached the statute of limitations issue at the hearing. Based upon the Court's conclusion that it lacks subject-matter jurisdiction over the SEC's claims against all five of the defendants in this case by operation of the five-year statute of limitations contained at 28 U.S.C. § 2462, the Court does not have occasion to reach, and therefore does not address, the second issue or any other issue raised in the parties' many and voluminous cross-motions for summary judgment.

into the source of great profit and wealth through their expertise in real estate development. Undervalued and decaying apartment complexes would be transformed by defendants' efforts into five-star luxury resort destinations, guaranteeing unit owners a river of rental income far into the future.

These promises were not kept. Instead, and in Ponzi scheme fashion, any returns paid to investors came from the funds of later investors. Any wild appreciation was artificially caused by self-dealing and undisclosed insider sales. Defendants eventually abandoned the development projects, and absconded with millions in misappropriated investor funds, leaving the investors with nothing. So the story goes.

The SEC investigated the case for at least seven years. The defendants were each summoned for extensive sworn statements. Former employees of defendants gave sworn statements. Banking and financial records were exhaustively analyzed. Some of the individual investors provided statements and other information to the SEC, while others sued the defendants themselves. But rather than expeditiously, or even promptly, bringing an enforcement action against the alleged fraudsters and peddlers of unregistered securities, the SEC waited.

Cay Clubs was in the real estate development business.[4] Defendant Fred Davis Clark ("Clark") was Cay Clubs' President and CEO. Defendant Cristal R. Coleman Clark ("Coleman") was a managing member and registered agent of various Cay Clubs entities as well as a sales agent. Defendant Barry J. Graham ("Graham") was the Director of Sales. Defendant Ricky Lynn Stokes ("Stokes"), while not directly employed by Cay Clubs, was a star sales agent. And Defendant David W. Schwarz ("Schwarz") was Cay Clubs' CFO and Vice President of Operations.

---

[4]     The recitation of the facts in this Order as they pertain to the scheme alleged by the SEC is drawn largely from the SEC's Statement of Undisputed Facts (DE #90-1), except where they conflict with or are unsupported by record evidence relevant to the applicability of the statute of limitations. Because the Court concludes that it lacks subject-matter jurisdiction over this case, the Court does not address the merits of the SEC's contention that the acts complained of in this case constituted the offering or sale of securities. For purposes of this Order, that contention is assumed to be true.

Beginning in July of 2004—and until some point prior to January 30, 2008—at seventeen properties from Key Largo, Florida to Las Vegas, Nevada, Cay Clubs offered and sold condominium units to private investors. Defendants marketed Cay Clubs as an investment. Cay Clubs would purchase and renovate aged and abandoned condominium projects using investors' funds from the purchase of individual units, and the investors would reap the rewards. Investors were attracted to Cay Clubs not only by the promise of wild appreciation, but also by "The Cay Clubs Concept": a package of commitments and services which included (1) a guarantee of an immediate return on investment of 15% of the purchase price returned at closing, (2) ensured rental income from Cay Clubs management of the rental of the units. Cay Clubs was the perfect passive investment opportunity. Investors had only to sit back and accumulate wealth from Cay Clubs' efforts.

First, Cay Clubs offered investors the opportunity to purchase condominium units at undervalued prices. Cay Clubs claimed to be in the position to purchase condominium buildings at below market prices, and could therefore let individual units go at below market value. This created "instant equity." In reality, Cay Clubs units were purchased by defendants on an insider basis, artificially inflating the unit value, and then sold to investors for much more than they were actually worth. That the prior sales had been to insiders was not disclosed to the unsuspecting investors. Any "instant equity" was based on this artificially inflated value.

Second, was the "leaseback" agreement, which while nominally "optional," was a major selling point and was ultimately entered into by between 96 and 99 percent of investors. This was the key to Defendants' scheme. Under the leaseback program, an investor would, after executing the purchase agreement, lease the unit back to Cay Clubs for a period of one to two years for Cay Clubs exclusive use, purportedly to complete renovations necessary to transform the property into a luxury resort. In exchange for this leaseback, investors would receive 15% of

their purchase price at or shortly after closing on the purchase. This attractive feature was advertised as a way for investors to pay their carrying costs for the term of the lease.

Third, Cay Clubs would use investors' funds and defendants' real estate development expertise to create a network of luxury resorts with a wide array of luxury amenities. When completed, the modest condominium units originally purchased by the investors would realize significant capital appreciation as part of this new network of resorts.

Fourth, along with renovating the aging condominium buildings themselves, investors who agreed to the leaseback would receive the benefit of Cay Clubs' renovating the investors units with up to $70,000 worth of new furnishings and fixtures, further increasing the units' value.

The fifth benefit to investors came in the form of a membership in Cay Clubs Resorts that would give investors themselves access to the luxury amenities at all the resorts. Membership was required with the purchase of a unit, and ranged in price from $5,000 to $35,000. And the membership itself was an investment opportunity; if an investor wanted to sell his unit he would receive back at closing the greater of either the full amount originally paid for it, or 80% of what the new investor paid for it.

Sixth, and another key feature of the Concept was a rental program whereby, after the leaseback period ended, Cay Clubs would exclusively manage the units and seek out tenants to rent them. Cay Clubs would distribute the rental revenue to the investors at a 35/65% split. Investors were promised by defendants that rental revenue would increase dramatically after the properties were fully developed into luxury resorts.

Finally, the Concept came with a built-in and proven exit strategy whereby, using relationships Cay Clubs had with lenders, investors could quickly sell their units for profit.

Accordingly, the Cay Clubs Concept was marketed and sold by defendants to investors as a passive investment in which Cay Clubs would use its business partnerships, options

agreements, and managerial and development expertise to generate profits for investors. Wholly dependent upon the efforts of defendants, investors would reap the reward with "no headaches" and then "retire rich and young in paradise."

None of the defendants ever registered themselves with the SEC, and the investment opportunity that was Cay Clubs was likewise never registered with the SEC.

Ultimately, there was no happy ending for Cay Clubs' investors. With the collapse of the real estate and credit markets beginning in or about late 2007, defendants abandoned development efforts on the properties and many investors' units went into foreclosure.

On January 30, 2013, the SEC filed a five-count complaint against all five defendants individually, variously alleging violations of the registration and anti-fraud provisions of the federal securities laws, alleging that Cay Clubs and defendants were offering and selling more than mere real estate; rather, they were offering and selling securities.[5] As relief for these alleged violations, the SEC sought the following against each defendant: declaratory relief that violations of the securities laws had occurred, injunctive relief barring future violations of the securities laws, and a sworn accounting and the repatriation and disgorgement of all ill-gotten gains realized from the alleged violations of the securities laws. Compl. DE #1 at 21–22; Am. Compl. DE #41 at 32–33. Additionally, the SEC sought civil money penalties from defendants Clark, Coleman, and Stokes. *Id.*

The defendants each rose as an affirmative defense and moved for summary judgment that the five-year statute of limitations at 28 U.S.C. § 2462 barred the SEC's claims. Both Graham and Schwarz resigned from and had no further involvement with Cay Clubs in October

---

[5]     Specifically as against each defendant, the SEC alleged that: "Clark, Coleman, Graham, and Stokes violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ('Securities Act') [15 U.S.C. §§ 77e(a) and (c), and 77q(a)]; and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ('Exchange Act') [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]"; that "Graham and Stokes violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]"; and that "Schwarz violated Section[s] 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act [15 U.S.C. §§ 77q(a)(1) and (3); 15 U.S.C. § 78j(b); and 17 C.F.R. § 240.10b-5(a) and (c)]." Am. Compl. DE #41 at ¶ 9.

of 2007. Clark, Coleman and Stokes stopped offering and selling Cay Clubs units at some point prior to December 31, 2007. The SEC waited to commence this action until January 30, 2013— more than five years after defendants' sale and offering of Cay Clubs units had ceased. Accordingly, defendants argued, the five-year limit set by § 2462 should apply to the SEC's claims as a complete bar to this litigation.

## II. DISCUSSION

Though not explicitly argued by defendants in seeking application of § 2462, as discussed at length below, the Court has *sua sponte* come to the conclusion that this particular statute's five-year limitations period operates to remove the Court's subject-matter jurisdiction to entertain the SEC's case as against each defendant.

### a. The Court has a duty to raise issues relating to its subject-matter jurisdiction *sua sponte*

Federal courts possess only the jurisdiction granted them by Congress, and are "obligated to inquire into subject-matter jurisdiction *sua sponte* whenever it may be lacking." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005); U.S. Const., Art. III, § 1; *see also Blankenship v. Gulf Power Co.*, 2013 WL 6084265, *2 (11th Cir. 2013). Further, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Finally, the "trial court is not bound by the pleadings of the parties, but may, of its own motion, if led to believe that its jurisdiction is not properly invoked, inquire into the facts as they really exist." *McNutt v. General Motors Acceptance Corp.* 298 U.S. 178, 184 (1936).

This is true even where, as here, discovery is complete, the record is closed, and the case has progressed to the summary judgment stage. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1240 (11th Cir. 2003) (reversing district court's entry of summary judgment on claims over which it lacked subject-matter jurisdiction, and noting that instead, "the district court should have dismissed [such] claims, *sua sponte* if necessary, pursuant to Fed. R. Civ. P.

12(h)(3)"); *see also Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1333 (11th Cir. 1998) (holding

that where "federal jurisdiction cannot be found, [a] district court's entry of summary judgment

[is] a nullity").

### b. 28 U.S.C. § 2462 is a "jurisdictional" statute of limitations

The term "'[j]urisdiction' refers to 'a court's adjudicatory authority.'" *Reed Elsevier, Inc.*

*v. Muchnick*, 559 U.S. 154, 160 (2010) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)).

"Accordingly, the term 'jurisdictional' properly applies only to 'prescriptions delineating the

classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction)' implicating

that authority." *Id.* at 160–61. Moreover, the term "subject-matter jurisdiction" is defined as "the

courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for Better*

*Env't*, 523 U.S. 83, 89 (1998) (emphasis in original). And just as it is true that federal courts

possess only the statutory power to adjudicate a given case established by Congress, Congress

may also act to limit the scope of that power, or remove it altogether.

In *Kontrick*, the Supreme Court held that Fed. R. Bankr. P. 4004(b)'s requirement that a

complaint objecting to a debtor's discharge in Chapter 7 bankruptcy proceedings "shall be filed

no later than 60 days after the first date set for the meeting of creditors" did not act as

jurisdictional. *See Kontrick*, 540 U.S. at 453–54. Unlike statutory limits on jurisdiction

prescribed by Congress, the Court reasoned, the Bankruptcy Rules are Court-prescribed rules of

practice and procedure which "do not create or withdraw federal jurisdiction." *Id.* at 453 (quoting

*Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365). Indeed, the Bankruptcy Rules

themselves state that they "shall not be construed to extend or limit the jurisdiction of the

courts." Fed. R. Bankr. P. 9030. "In short," the Court concluded, "the filing deadlines prescribed

in Bankruptcy Rule 4004 [is] a claim-processing rule[] that [does] not delineate what cases

bankruptcy courts are competent to adjudicate." *Id.* at 454.

In determining whether a given statute operates as a "jurisdictional" condition—one which implicates the power of a federal court to adjudicate a case—or simply as a "claim-processing rule" which does not implicate that power, a court is to look at the plain meaning of the enactment. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006). Accordingly, where Congress "clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts . . . will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation . . . as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Id.*

The Supreme Court in *Arbaugh* examined the text of 42 U.S.C. § 2000e(b) in the context of a claim for sex discrimination brought under Title VII of the Civil Rights Act of 1964. *Id.* at 503. Title VII makes it unlawful "for an employer . . . to discriminate," *inter alia*, on the basis of sex. 42 U.S.C. § 2000e–2(a)(1). The Act's jurisdictional provision empowers federal courts to adjudicate civil actions "brought under" Title VII. § 2000e–5(f)(3). Section 2000e(b) defines "employer" as having "fifteen or more employees." In holding that § 2000e(b)'s numerosity requirement was not jurisdictional, but rather a "substantive ingredient of a Title VII claim for relief," the Supreme Court focused principally on the absence of language indicating that this requirement was intended to "count as jurisdictional." *Id.* at 515. Moreover, that § 2000e(b) was definitional and did not appear in location or structure to be intended to curtail a court's jurisdiction argued against treating it as jurisdictional. *Id.* at 515–16.

Standing in stark contrast to the claim-processing rules and substantive ingredients of claims that the Supreme Court has cautioned lower courts against reading as jurisdictionally limiting are statutes of limitation, which by their very nature seek to limit either which claims can be brought into court, or which claims a court may entertain. As the Supreme Court has observed:

"Most statutes of limitations seek primarily to protect defendants against stale or unduly delayed claims. Thus, the law typically treats a limitations defense as an

affirmative defense that the defendant must raise at the pleadings stage and that is subject to rules of forfeiture and waiver. . . . <u>Some statutes of limitations, however, seek not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal,</u> such as facilitating the administration of claims, limiting the scope of a governmental waiver of sovereign immunity, or promoting judicial efficiency. <u>The Court has often read the time limits of these statutes as more absolute,</u> say as requiring a court to decide a timeliness question despite a waiver, or as forbidding a court to consider whether certain equitable considerations warrant extending a limitations period."

*John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 133 (2008) (emphasis supplied, internal citations and quotation marks omitted). The Court has referred to these second, "more absolute" statutes of limitations as "<u>jurisdictional.</u>" *Id.* at 134 (emphasis supplied) (citing *Bowles v. Russell,* 551 U.S. 205 (2007)).

In *Bowles,* decided after *Arbaugh* and *Kontrick,* the Supreme Court reaffirmed that "[a]lthough several of [the Court's] recent decisions have undertaken to clarify the distinction between claims-processing rules and jurisdictional rules, none of them calls into question our longstanding treatment of statutory time limits for taking an appeal as jurisdictional. Indeed, those decisions have also recognized the <u>jurisdictional significance of the fact that a time limitation is set forth in a statute.</u>" *Bowles,* 551 U.S. at 210–11 (highlighting that the time limit at issue in *Kontrick* found in Fed. R. Bankr. P. 4004 did not affect the court's subject-matter jurisdiction in that case largely because it was a <u>non-statutory</u> rule of procedure "adopted by the Court for the orderly transaction of its business," and that the numerosity requirement in *Arbaugh* was not jurisdictional, but was also not a time limit) (emphasis supplied). Accordingly, statutes of limitation—specifically the "more absolute" type that by their very text speak to the power of a court to act in a given case as opposed to the type that "seek primarily to protect defendants against stale or unduly delayed claims"—can operate to remove from the court's adjudicatory authority those claims not brought within the time limit specified by such a statute. The five-year time limit contained at 28 U.S.C. § 2462 is just such a statute.

Title 28 U.S.C. § 2462 provides in pertinent part:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, <u>shall not be entertained unless commenced within five years from the date when the claim first accrued.</u>

(emphasis supplied). The Supreme Court in *Gabelli v. SEC*, 133 S. Ct. 1216, 1220–21 (2013) recently laid to rest any question of what the statutory text "when the claim first accrued" means. *Gabelli*, 133 S. Ct. at 1220 ("a claim . . . accrues—and the five-year clock begins to tick—when [the conduct giving rise to the claim occurs]"). The Court went on to explain that this "most natural reading of the statute," *id.*, "sets a fixed date when exposure to the specified Government enforcement effort ends, advancing 'the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities.'" *Id.* at 1221 (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). Accordingly, the latest point at which a claim may accrue is the date on which the last act giving rise to the plaintiff's "complete and present cause of action" occurs. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007). In *Gabelli*, where the SEC's claim was based on fraud, the SEC's claim accrued "when the defendant's allegedly fraudulent conduct occur[ed]." *Gabelli*, 133 S. Ct. at 1220. Here, because the SEC's claim is based upon the offering and sale of what it alleges to be securities, the latest point at which the SEC's claim could accrue is the date on which a defendant last sold or offered the alleged security.

Because the date of accrual is a fixed and knowable date, and the Government cannot take advantage of the fraud discovery rule to delay claim accrual, the Government must commence the cause of action within five years of the last act giving rise to the claim or such a claim "<u>shall not be entertained.</u>" This statutory language is a congressional removal of a court's power to entertain—its adjudicatory authority and jurisdiction—cases not brought within five years of accrual. Indeed, this language amounts to an "<u>unequivocal statutory command to federal</u>

courts not to entertain" an untimely claim. *See Swain v. Pressley*, 430 U.S. 372 (1977) (interpreting an identical statutory proscription found in D.C. Code § 23-110(g) (1973)).

In a case such as this, where the offering and sale of alleged securities was done by each of the defendants multiple times and over the course of several years, discerning from the record the absolute last date on which each defendant committed an act of offering or selling in relation to the date on which the SEC commenced this action is determinative of whether the Court has jurisdiction to entertain the claim as against each defendant. Looked at another way, where the last act of each defendant giving rise to the SEC's claim against such defendant was not committed within five years prior to the SEC's filing of its complaint—a window of time the Court and parties have referred to as the "red zone"—if § 2462 applies to the SEC's claims, it operates to divest the Court of the power to entertain that claim. Because the SEC filed its complaint on January 30, 2013, if the last act of any defendant did not occur within the "red zone", or between January 30, 2008 and January 30, 2013, the Court would lack subject-matter jurisdiction to adjudicate the claim as against that defendant.

### c. The five-year statute of limitations contained at 28 U.S.C. § 2462 applies to all forms of relief sought by the SEC

Title 28 U.S.C. § 2462 imposes a five-year statute of limitations on certain actions, suits, or proceedings brought by the United States government, including SEC enforcement actions. The statute provides in full:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

The question that confronts the Court is whether this statute—which explicitly applies to actions "for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise"— also applies to other forms of relief the SEC might seek by a given action. Specifically here,

where the SEC seeks declaratory relief, injunction, and disgorgement, if those forms of relief fall outside of § 2462's reach, as is the SEC's position, the SEC can bring such claims without regard to how far in the past the acts giving rise to the claim occurred. If, however, these forms of relief are within § 2462's reach, the SEC's action may be barred if not timely brought.

As discussed above, the Supreme Court, in a unanimous opinion issued last term, had occasion to interpret the scope of the phrase "when the claim first accrued" contained in § 2462, and decided that the most natural meaning of the phrase is that a claim accrues when the act giving rise to the claim actually occurs. *Gabelli* 133 S. Ct. at 1220–21 (further holding that the SEC, when acting in its enforcement capacity, cannot take advantage of the fraud discovery rule to delay the date of accrual). While the Supreme Court there expressly declined to reach the question whether injunctive relief and disgorgement are also covered by § 2462, as the question was not properly before it, *id.* at 1220 n.1, this Court believes that the long-held policies and practices that underpin the Supreme Court's unanimous opinion in *Gabelli*, as well as the text of the statute itself, require the conclusion that § 2462 does reach all forms of relief sought by the SEC in this case.

In declining to allow the SEC to take advantage of the fraud discovery rule in bringing an enforcement action (as opposed to an action where the Government itself is a victim of a fraud), the Supreme Court expressed great concern for "leav[ing] defendants exposed to government enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future." *Id.* at 1223. The Court reaffirmed that it would reject a rule that would "'extend[] the limitations period to many decades' because such a rule was 'beyond any limit that Congress could have contemplated' and 'would have thwarted the basic objective of repose underlying the very notion of a limitations period.'" *Id.* (quoting *Rotella v. Wood*, 528 U.S. 549, 554 (2000)). The Court invoked Chief Justice Marshall's "particularly forceful language . . . emphasizing the importance of time limits on penalty actions" that "it would be utterly repugnant

13

to the genius of our laws if actions for penalties could be brought at any distance of time." *Gabelli*, 133 S. Ct. at 1223 (quoting *Adams v. Woods*, 2 Cranch 336, 342 (1805) (Marshall, C.J.)).

The Court reaffirmed that statutes of limitation, which "provide security and stability to human affairs," are indeed "vital to the welfare of society." *Id.* at 1221 (internal citations and quotation marks omitted). And the Court underscored the importance of "the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Id.* Ultimately, the Court unanimously reaffirmed the principle that "even wrongdoers are entitled to assume that their sins may be forgotten." *Id.* (quoting *Wilson v. Garcia*, 471 U.S. 261, 271 (1985)).

The SEC's position with regard to § 2462—that it does not apply where, as here, the SEC seeks disgorgement, injunction, and declaratory relief—would make the Government's reach to enforce such claims akin to its unlimited ability to prosecute murderers and rapists. For support of this position, the SEC points to *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997), wherein the Eleventh Circuit held that "absent a clear expression of Congress to the contrary—a statute of limitation does not apply to claims brought by the federal government in its sovereign capacity." The Court in *Banks*, pointing to two district court decisions from outside the Eleventh Circuit, concluded that the "plain language of § 2462 does not apply to equitable remedies,"[6] and that therefore the "clear expression of Congress" required before application of the statute of limitations was not present in § 2462. *Id.* The Eleventh Circuit in *Banks*, however, as well as the only published district court decision it relied on regarding § 2462's coverage of equitable remedies, dealt with a different kind of equitable remedy seeking to enjoin a different kind of harm than at issue in this case. In both *Banks* and *Hobbs*, the United States in its sovereign capacity sought to enforce the Clean Water Act, and in each case sought to enjoin the discharge

---

[6]     *See id.* (citing to an unpublished order in *North Carolina Wildlife Federation v. Woodbury*, Case No. 87-584-CIV-5 (E.D.N.C. 1989), and quoting *United States v. Hobbs*, 736 F.Supp. 1406, 1410 (E.D. Va. 1990)).

of fill into U.S. waters. *See id.* at 918; *Hobbs*, 736 F. Supp. at 1407. The harm complained of was continuing in nature in both cases, and enjoining the continuing harm was the purpose of the enforcement action; it was not to punish defendants for discharging the fill. Because the injunction sought was not in nature a "penalty," which is expressly covered by § 2462, there was no "clear expression of Congress" that § 2462 should apply to bar the government's enforcement action in that case.

In essence, the SEC's argument in this case is that because the words "declaratory relief," "injunction," and "disgorgement" do not appear in § 2462, no statute of limitations applies. The principles underlying the Supreme Court's decision in *Gabelli*, however, counsel against accepting the SEC's argument. Penalties, "pecuniary or otherwise," are at the heart of all forms of relief sought by the SEC in this case. First of all, by its very terms, the SEC's complaint seeks to have the Court, by way of a declaration that the defendants have violated the federal securities laws, "label defendants wrongdoers." *See Gabelli*, 133 S. Ct. at 1223 (discussing what constitutes a penalty and then invoking the powerful words of Chief Justice Marshall that "it would be utterly repugnant to the genius of our laws if actions for penalties could be brought at any distance of time"). Similarly, the injunctive relief sought by the SEC in this case forever barring defendants from future violations of the federal securities laws can be regarded as nothing short of a penalty "intended to punish," especially where, as here, no evidence (or allegations) of any continuing harm or wrongdoing has been presented. Finally, the disgorgement of all ill-gotten gains realized from the alleged violations of the securities laws—*i.e.*, requiring defendants to relinquish money and property—can truly be regarded as nothing other than a forfeiture (both pecuniary and otherwise), which remedy is expressly covered by § 2462. To hold otherwise would be to open the door to Government plaintiffs' ingenuity in creating new terms for the precise forms of relief expressly covered by the statute in order to avoid its application.

### d.  Plaintiff bears the burden of establishing jurisdiction

This case has progressed to the summary judgment stage, and the Court has heard oral argument on all the parties' cross-motions for summary judgment. But the burdens of proof on which the Court must base its decision in this case are not the usual burdens applicable to summary judgment. Accordingly, it is necessary to briefly discuss the relevant burdens of proof in place which govern the Court's decision.

Usually the movant on summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the movant makes that initial showing, the burden shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (holding that the nonmoving party must "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact"). Accordingly, if § 2462 were a nonjurisdictional statute of limitations, defendants in moving for summary judgment that it should apply would bear the usual summary judgment burden that all movants must carry. Indeed, several times throughout oral argument, and when asked directly by the Court to pinpoint an act by any defendant in the "red zone," the SEC responded that it was not their burden to pinpoint such an act, but simply to come forward with some facts that showed there was an issue for trial on that point. *See, e.g.,* Transcript of Oral Argument at 67: 7–8; 77: 16–17. Here, however, because § 2462 is a jurisdictional statute of limitation which operates to remove the Court's subject-matter jurisdiction to entertain cases not brought within the statutory time limit, the burden that governs this Court's decision is not the usual burden that governs at summary judgment, and it is the SEC who bears this burden.

"The burden of establishing jurisdiction rests upon the party seeking to invoke it, and it cannot be placed upon the adversary who challenges it." *Gaitor v. Peninsular & Occidental Steamship Co.*, 287 F.2d 252, 253 (5th Cir. 1961)[7] (citing *Carson v. Dunham*, 121 U.S. 421, 425 (1887). Further, and controlling here, the Supreme Court long ago held, in referring to specifically defined statutory prerequisites to the exercise of a court's jurisdiction:

> They are conditions which must be met by the party who seeks the exercise of jurisdiction in his favor. He must allege in his pleading the facts essential to show jurisdiction. If he fails to make the necessary allegations he has no standing. If he does make them, an inquiry into the existence of jurisdiction is obviously for the purpose of determining whether the facts support his allegations. In the nature of things, the authorized inquiry is primarily directed to the one who claims that the power of the court should be exerted in his behalf. As he is seeking relief subject to this supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in court. The authority which the statute vests in the court to enforce limitations of its jurisdiction precludes the idea that jurisdiction may be maintained by mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure. If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof. And where they are not so challenged the court may still insist that the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of the evidence.

*McNutt v. General Motors Acceptance Corp.* 298 U.S. 178, 189 (1936) (emphasis supplied).

Accordingly, the SEC carries the burden "throughout the litigation of showing that [it] is properly in court" and the SEC must establish the Court's jurisdiction by preponderance of the evidence. It is because the defendants have each challenged the SEC's allegations that their sale or offering of alleged securities continued into the "red zone," and because the Court could not locate competent proof on that allegation on its own in this closed record that it asked the SEC to pinpoint any such acts, if it could. The SEC's failure to carry its burden of pointing to such an act by any of the defendants results in the failure of the Court's jurisdiction over such a defendant.

---

[7]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

### e. The SEC has failed to meet its burden of establishing that the Court has subject-matter jurisdiction over its claims against all defendants

Discovery is now complete, and the record in this case is now closed.[8] The SEC's investigation of this case stretches back at least to late 2007.[9] After nearly seven years—and even with the "many legal tools" at its disposal to aid in investigation[10]—the SEC has not been able to point to any act of offering or sale of alleged securities by any of the defendants in the "red zone," after January 30, 2008. Although the complaint alleged that Cay Clubs' business activities continued from "no later than November 2004 to at least July 2008," Am. Compl. DE #41 at ¶ 2, the SEC's proof has not borne out that allegation as to the individual defendants.

As a preliminary matter, on the eve of the scheduled oral argument on the parties' cross-motions for summary judgment, the SEC filed a "Notice of Filing Supplemental Evidence in Support of Summary Judgment" (DE #179) to which it attached the declarations of two individuals, not parties to this case, which purported to support its claims that the statute of limitations should not apply and that the transactions involved the offering and sale of securities. Defendants Clark, Coleman, and Schwarz immediately moved to strike (DE #180) these declarations as untimely pursuant to Fed. R. Civ. P. 6(c)(2) (requiring affidavits in support of motions to be filed with the motions they are intended to support, or at least 7 days prior to any hearing on such motions). At oral argument, the Court advised the parties that it would consider the motion to strike only if the declarations were relevant to either the statute of limitations or the

---

[8]    *See* the Court's Scheduling Order at DE #16; Order Cancelling Trial at DE #182 (concluding that, because the SEC did not elect to accept the Court's suggestion that the record be reopened and an evidentiary hearing held on this issue, "The record shall remain closed, and the Court shall render its decision on the statute of limitations issue . . . based upon the record before the Court.").

[9]    *See* SEC's October 4, 2007, letter and Form 1662 to defendant Clark as Chief Executive Officer of Cay Clubs International, LLC (DE #119-1) (advising Clark that the SEC was "conducting a confidential, non-public investigation into Cay Clubs International, LLC to determine whether there have been any violations of the federal securities laws.")

[10]    *See Gabelli*, 133 S. Ct. at 1222 (highlighting some of the investigative tools the SEC has to aid it in carrying out its core mission).

securities issue. If the declarations were not relevant to either issue, the motion to strike would be denied as moot.

Because the Court has only reached the statute of limitations issue, the Court has reviewed each declaration and finds that they do not amount to evidence of an act of selling or offering alleged securities within the "red zone" by any defendant, and are accordingly not relevant to the Court's determination of that issue. Each declaration simply repeats verbatim— and without any further support—the SEC's allegations in its complaint that Cay Clubs business operations continued until "at least July 2008." DE #179-1, p. 6 ¶ 1; DE #179-2, p. 6 ¶ 1. These wholly unsupported statements are not sufficient to meet the SEC's burden of proof by preponderance of the evidence that any defendant sold or offered alleged securities after January 30, 2008. The defendants Motion to Strike as it pertains to the statute of limitations issue is therefore denied as moot.

Next, the proof shows, and the SEC appears to agree, that at least two of the five defendants, Graham and Schwarz, had no further involvement with Cay Clubs after October of 2007, and certainly did not offer or sell any alleged securities in the "red zone." First, based upon its apparent recognition that, if it protected defendants against anything, 28 U.S.C. § 2462 barred claims for civil money penalties not brought within five years of accrual of such claim, the SEC did not seek civil money penalties against Graham and Schwarz. *See* Am. Compl. DE #41 at 33. Moreover, throughout the depositions of each of these two defendants, the SEC repeatedly asked and confirmed that their relationship with Cay Clubs ended in October of 2007.[11] The SEC did not challenge these assertions, and in its Statement of Undisputed Facts appears to agree.[12] Accordingly, because the SEC has not shown that either defendants Graham or Schwarz

---

[11]    *See, e.g.*, Graham Deposition Transcript DE #92-16 at 16: 2–20, 29: 7–10, 63: 6–8, 64: 20–21; Schwarz Deposition Transcript DE #92-4 at 14: 10–15, 22: 22–25, 44: 2–4, 76: 5–7.

[12]    The SEC describes Schwarz's involvement with cay Clubs as spanning "from July 2004 until at least September, 2007" (*see* DE #90-1 at ¶ 26–27), and Graham's involvement as spanning from "no later than August 2005 until October 2007" (*id.* at ¶ 45).

committed any of the acts which give rise to the SEC's claims in this case after January 30, 2008, the Court is without jurisdiction over the SEC's claims against these two defendants.

With respect to defendant Coleman, when pressed at oral argument to pinpoint any act of selling or offering alleged securities after January 30, 2008 the SEC was able only to point to an exchange in Coleman's long deposition, and an arrest record, which the SEC claimed when read together proved (or at least satisfied the burden they assumed they bore on summary judgment) that Coleman's acts were within the "red zone." *See* Transcript of Oral Argument at 93–95. The SEC's argument goes as follows: Coleman was arrested on October 9, 2008. DE #125-6. In Coleman's deposition, she testified that she took over managing a company called "Cristal Clear Rentals" in late 2007, and that this company at one time had been part of the 100-plus corporations that comprised Cay Clubs. *See* Coleman Deposition Transcript DE #92-14 at 93. When asked at her deposition whether "Cristal Clear Rentals" was still in operation when Coleman was arrested in October of 2008, Coleman responded that "Cristal Clear Rentals" had closed "probably six or seven months before" her arrest. *Id.* at 106. Accordingly, the SEC would have the Court find that this is proof that Coleman was carrying on Cay Clubs' business "six or seven months" prior to October of 2008, or sometime in March or April of that year, which would be within the "red zone." *See* Transcript of Oral Argument at 94. The Court rejected at oral argument the proposition that this line of questioning coupled with conjecture about Coleman's arrest and the closing of "Cristal Clear Rentals" could amount to "proof" of anything, *id.* at 95, and here concludes that it does not meet the SEC's burden of proof by a preponderance of the evidence that Coleman sold or offered alleged securities after January 30, 2008.

Furthermore, even if the Court were inclined to allow this vague line of questioning to amount to the proof required of an act by Coleman within the "red zone," the act proved is not one of selling or offering alleged securities. Coleman testified at her deposition, and the SEC has not disputed, that "Cristal Clear Rentals," the company that she took over in late 2007, was not at

that time in the business of selling or offering real estate for sale, but rather was in the business of managing rental houses and other properties in the Florida Keys wholly unconnected to any of the Cay Clubs properties. *See* Coleman Deposition Transcript DE #92-14 at 93–106. Accordingly, because the SEC has not shown that Coleman committed any of the acts which give rise to the SEC's claims in this case after January 30, 2008, the Court is without jurisdiction over the SEC's claims against Coleman.

Defendants Clark and Stokes present a closer question, but ultimately the Court concludes that the SEC has not shown by a preponderance of the evidence that either of these two remaining defendants committed any acts of selling or offering securities within the "red zone." Defendant Clark testified at his deposition that Cay Clubs' operations and his offering and sale of Cay Clubs condominium units ceased in October of 2007 when Cay Clubs defaulted on a $25 Million note held by an entity called the Abel Band Group for which the Cay Clubs properties and ownership stakes served as collateral. *See* Clark Deposition Transcript DE #92-1 at 36–37. Clark further testified that he "assisted in the windup of things for the different stakeholders for six months after that." *Id.* at 36. Separately, in investigatory testimony given before the SEC in May of 2011, Clark testified that he had worked to "unwind" Cay Clubs "during 2008, 2009, early 2009" but that he didn't know the exact date, or the exact date of the last sale of a condominium unit. *See* Clark Investigative Testimony DE 125-7 at 79. This "unwinding" without any proof of the sale or offering of alleged securities is hardly proof that Clark offered or sold alleged securities after January 30, 2008.

The SEC next points to a passage of Clark's deposition transcript wherein, in reviewing a series of emails from early February 2008, Clark said he would agree to sign an addendum to an agreement to facilitate the sale of a Las Vegas condominium unit to a Scott Marz. *See* Clark Deposition Transcript at 77–82. Clark was then presented at the deposition with a blank and unexecuted closing statement purporting to be the closing statement for Holly and Scott Marz's

21

purchase of a Las Vegas condominium unit, and on which—in the box designated for the seller and grantor, and underneath the blank signature lines—Clark's name appears. *Id.* at 90. However, when asked whether Clark ever executed this blank document, his response was "I don't know." *Id.* at 92. Rather than confronting Clark at that point with an executed copy of the document in question, or introducing one at any other point in this voluminous record, the SEC moved on from that line of questioning. *See id.* The SEC's unexecuted documents, especially in the absence of evidence that Clark ever executed them, do not amount to proof sufficient to meet the SEC's burden on this point. Moreover, the only executed document relating in any way to the Marz property was executed not by Clark, but by David Band, the principal of the Abel Band Group and not a party to this case. *See* Deed to Scott and Holly Marz, Clark County Nevada record DE #168-2. Accordingly, because the SEC has not shown that Clark committed any of the acts which give rise to the SEC's claims in this case after January 30, 2008, the Court is without jurisdiction over the SEC's claims against Clark.

The SEC has also failed to show by a preponderance of the evidence that defendant Stokes offered or sold alleged securities in the "red zone." In support of their contention that Stokes' acts do fall within the "red zone," the SEC points principally to the two-page Declaration of Scott Marz found at DE #125-2. Therein, Marz declares that in "approximately November of 2007" he "attended a Cay Clubs presentation given by Ricky Stokes" at which presentation Stokes offered Cay Clubs condominium units with the leaseback agreement, and that based upon Stokes representations, Marz decided to invest. So, in "approximately March or April 2008" Marz and his wife purchased one Las Vegas condominium unit. Marz does not testify or declare from whom he bought his Las Vegas condominium unit in March or April of 2008, and does not state that he purchased it from Stokes, declaring only that it was part of the "Cay Clubs Las Vegas location." Moreover, from a fair reading of the declaration, in the absence of any other supporting documentation in the record, the Court can only conclude that Stokes'

November 2007 presentation inspired Marz's subsequent purchase of the Las Vegas unit. Particularly when coupled with the Deed to Scott and Holly Marz (DE #168-2) executed not by Stokes (or Clark, or anyone else associated with Cay Clubs) but by David Band and in which a company named Sarasota Coast Investors, LLC (not Cay Clubs) deeds a Las Vegas condominium unit to the Marzes, the SEC's attempt to show that Stokes sold the unit in question fails. Accordingly, because the SEC has not shown that Stokes committed any of the acts which give rise to the SEC's claims in this case after January 30, 2008, the Court is without jurisdiction over the SEC's claims against Stokes.

Finally, in an attempt to show that Cay Clubs in general was still in operation until at least January 30, 2008, the SEC appended to its Response to Stokes Statement of Undisputed Facts a Cashier's Check issued on January 30, 2008 and drawn on an account in the name of Cristal Clear Realty, LLC made payable to a "Carlos and Martha Gonzalez" with a memo line that reads "Leaseback Unit 4711." This check, which does not appear to be connected by any evidence to any of the individual defendants, cannot amount to proof by preponderance of the evidence that any of the defendants were offering or selling alleged securities on January 30, 2008. Further, even if the record were clear that one or all of the defendants were responsible for this check, it only tends to show that Carlos and Martha Gonzalez were offered and ultimately sold a unit and entered into a leaseback agreement at some point prior to the critical date of January 30, 2008. This act is accordingly not within the "red zone" and cannot be the basis for the Court's jurisdiction over the SEC's claim.

Having not carried its burden of showing by a preponderance of the evidence that any of the defendants committed any acts giving rise to the SEC's claim—the offering or selling of alleged securities—after the critical date of January 30, 2008, the Court is left to conclude that it is without subject-matter jurisdiction over this case, and therefore it must be dismissed pursuant to Fed. R. Civ. P. 12(h)(3).

23

**f.  Dismissal should be with prejudice**

The Court is mindful that ordinarily a dismissal for lack of subject-matter jurisdiction is not a determination on the merits, and usually operates therefore as a dismissal without prejudice. *See Crotwell v. Hockman-Lewis Ltd.*, 734 F.2d 767, 769 (11th Cir. 1984);[13] Fed. R. Civ. P. 41(b). However, the Court's conclusion in this case that it lacks subject-matter jurisdiction has been reached at a much different stage in the litigation than the normal decision on a motion to dismiss (as was the case in *Crotwell*). The Court's dismissal here is based on the Plaintiff's failure—after nearly seven years of investigation, after the close of all discovery and motion practice, after full and exhaustive oral argument, and after giving the Plaintiff an opportunity to re-open the record and present new evidence on the issue—to carry its burden of establishing that the Court has jurisdiction over Plaintiff's claims by operation of a statutory proscription against entertaining such claims. It is the view of the Court that, in light of the stage in this case at which it has determined that it lacks subject-matter jurisdiction, Plaintiff's claims should be dismissed with prejudice. The very purpose of statutes of limitation support this conclusion, and "even [alleged] wrongdoers are entitled to assume that their [alleged] sins may be forgotten." *Gabelli*, 133 S. Ct. at 1221 (quoting *Wilson v. Garcia*, 471 U.S. 261, 271 (1985)).

**III. CONCLUSION**

This is a case in which the SEC—the Agency whose principal mission it is to "protect investors and the markets by investigating potential violations of the federal securities laws"[14]—failed to meet its serious duty to timely bring this enforcement action.

Accordingly, because the five-year statute of limitations found at 28 U.S.C. § 2462 is jurisdictional and applies to all forms of relief sought by the SEC in this case, and the SEC—

---

[13]     At least one court has recognized the foundation of the Eleventh Circuit's statement in *Crotwell* that it was error to dismiss "with prejudice" a complaint for lack of subject-matter jurisdiction was rejected by the Supreme Court in *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001). *See Styskal v. Weld County Bd. of County Com'rs*, 365 F.3d 855, 858–59 (10th Cir. 2004).

[14]     *See Gabelli*, 133 S. Ct. at 1222 (citing SEC, Enforcement Manual 1 (2012)).

after full discovery and opportunity to develop the record—has not met its burden of establishing this Court's jurisdiction, and the Court having carefully considered the entire record and being otherwise fully advised, it is hereby **ORDERED, ADJUDGED AND DECREED** that this case is **DISMISSED WITH PREJUDICE**. All pending motions are hereby **DENIED** as moot and the Clerk shall **CLOSE** the case.

**DONE AND ORDERED** in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 12th day of May, 2014.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

cc:     **All Counsel of Record**

**Barry J. Graham**, *pro se*
9270 Triana Terrace Unit 3
Ft. Myers, FL 33912